MELINDA HAAG (CABN 132612)
United States Attorney

J. DOUGLAS WILSON (DCBN 412811)
Chief, Criminal Division

ADAM A. REEVES (NYBN 2363877)
ROBERT S. LEACH (CABN 196191)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    Fax: (415) 436-7234
    Adam.Reeves@usdoj.gov
    Robert.Leach@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>KARIM ISKANDER BAYYOUK,<br><br>    Defendant. | Case No. CR 12-0420 EMC<br><br>UNITED STATES' SENTENCING MEMORANDUM<br><br>Date:    April 15, 2014<br>Time:   2:15 p.m.<br>Court:  Hon. Edward M. Chen |

    The United States respectfully submits this Sentencing Memorandum pursuant to Federal Rule of Criminal Procedure 32 and Criminal Local Rule 32-5.

## INTRODUCTION

    On September 3, 2013, following a jury trial, the defendant was found guilty of obstruction of justice, in violation of 18 U.S.C. § 1505. The United States Probation Office calculates the defendant's total offense level under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") to be 17, which results in a sentencing range of 24 to 30 months in prison for Criminal History Category I. *See* Presentence Report ("PSR") ¶¶ 61-69. The PSR recommends a 24-month prison sentence, at the low end of the applicable range. The United States agrees with the PSR's Guideline calculation, and

1   while the government agrees a Guideline sentence is appropriate, the government respectfully submits a

2   27-month sentence is sufficient, but not greater than necessary, to meet the goals of sentencing.

3                                   **THE DEFENDANT'S OFFENSE CONDUCT**

4           As the trial evidence demonstrated, Bayyouk's obstruction of justice is inextricably intertwined

5   with a three-year insider trading scheme in his extended family.  Between 2004 and 2007, Mahar Kara,

6   an investment banker with Citigroup, disclosed material nonpublic information relating to corporate

7   transactions involving Citigroup's clients to his brother, Mounir ("Michael") Kara.  Michael Kara, in

8   turn, tipped the inside information to Bassam Salman (Bayyouk's brother-in-law and Maher Kara's

9   brother-in-law).[1]  Salman passed along Michael Kara's tips to Bayyouk, his secret trading partner, who

10  bought and sold risky call and put options and other securities based on the tips.

11          Evidence adduced at trial demonstrates that, at a minimum, Bayyouk had reason to know Salman

12  was attempting to conceal the trading.  *See* PSR ¶ 12.  Although Salman maintained a brokerage account

13  in his own name, Salman did not trade in any of the securities recommended by Michael Kara in that

14  account.  *See* Ex. B (Trial Ex. 87).  Instead, Salman passed along the tips to Bayyouk, who bought and

15  sold securities in a Comerica brokerage account in the name of Bayyouk and Bayyouk's wife that was

16  largely inactive until late November 2004.  Evidence showed that much of the initial funding for the

17  Comerica account was cash.  *See* Ex. C (Trial Ex. 92) & Ex. D (8/30/2013 Testimony of Jeffrey

18  Chisholm at 361-363).  Depositing the cash required multiple trips to the bank by Bayyouk, which gives

19  rise to the reasonable inference that the only purpose served by this laborious process was concealment.

20  Evidence also showed that, while Salman was the source of approximately two-thirds of the money

21  coming into the Comerica account, Bayyouk received more than half of the after-tax proceeds coming

22  out of the account.  *See* Ex. E (Trial Ex. 418).  The government proved that Bayyouk earned net profits

23  of at least $1,575,098.25 trading on Salman's and Michael Kara's tips.  *See* Ex. F (Trial Ex. 78)

24  (detailing profits and trading pattern in Protein Design Labs, Bone Care, Endo Pharma, Andrx, HCA,

25  USPI, PDL Biopharma, Biosite, and Alexion); PSR ¶ 42.

26

27  [1]      Exhibit 1 from the Salman trial summarizes the various family relationships.  It is attached to this
    Sentencing Memorandum as Exhibit A.

28

The defendant's most successful trade involved Biosite.  At 3:45 a.m. Eastern on March 23, 2007, based on an urgent tip from Salman, Bayyouk started buying risky Biosite call options.  *See* Ex. G (Trial Ex. 420).  It was the first time Bayyouk had ever traded in Biosite.  He would never trade in it again.  Shortly after Biosite announced it was being acquired, Bayyouk liquidated his entire investment for a profit of nearly $1 million.  Bayyouk also passed on the tip to his brother, Hani Bayyouk, who also profited investing in Biosite.  *See* PSR ¶ 41.

In April 2007, the Securities and Exchange Commission ("SEC") commenced a formal investigation into possible insider trading in Biosite.  *See* PSR ¶ 33.  SEC investigators called Bayyouk several times in late May 2007 and ultimately left a message requesting that Bayyouk contact them.  *See* PSR ¶ 40; Ex. H (Trial Ex. 410 at 11-12).  Bayyouk thus had time to seek advice and consider his response to the SEC.

On May 31, 2007, Bayyouk responded to SEC investigators and was interviewed for approximately 31 minutes.  *See* PSR ¶ 40; Ex. I (Trial Ex. 68).  During the May 31, 2007 interview, Bayyouk told an elaborate lie to conceal the trading scheme.  He stated:

- He did not discuss stocks with anyone other than his brother, Hani Bayyouk.
- He bought Biosite options based on his own independent research.
- He did not discuss Biosite with anyone before investing.
- No one suggested Biosite to him.
- He had heard nothing about a merger or acquisition before investing in Biosite.
- He did not suggest Biosite to Hani Bayyouk.
- He traded because of a change in the volume of Biosite trading.

*Id.*  The evidence proved that, contrary to his statement to the SEC, Bayyouk bought Biosite and other securities, not because of independent investment decisions based on his own research, but because he was tipped by Salman.  The evidence also proved Bayyouk tipped his brother about Biosite.  PSR ¶ 41.

Bayyouk obstructed the SEC investigation for reasons that many criminals obstruct justice: greed and a misguided belief he could not be caught.  If Bayyouk had told the truth to SEC investigators, it would have put his $1 million Biosite jackpot in jeopardy.  It would have exposed his secret trading

1  partner, Bassam Salman.  It would have subjected the defendant and others to increased regulatory

2  scrutiny and potential criminal liability.  And Bayyouk presumed that if his secret trading partner

3  maintained his anonymity (or, if discovered, his silence), the SEC would have no direct proof to

4  contradict his statement that he did all the trading on his own.

5        Finally, the evidence at trial demonstrated that Bayyouk's obstruction caused the unnecessary

6  expenditure of substantial governmental resources and thereby substantially interfered with the

7  administration of justice.  *See* PSR ¶ 43.  By concealing the fact that he was tipped by Salman, Bayyouk

8  essentially set the SEC back six months in its effort to determine the link between Maher and Michael

9  Kara, on the one hand, and Bayyouk, on the other.  According to the trial testimony of Patrick Murphy, a

10  Branch Chief in the SEC's Division of Enforcement in 2007, the SEC was trying to establish

11  connections between potential insiders (e.g., Maher Kara) and traders (e.g., Bayyouk).  *See id.*; Ex. J

12  (8/30/2007 Testimony of Patrick Murphy at 11-13).  As a result of Bayyouk's obstruction, the SEC "had

13  to do a lot of work . . . [which] largely consisted of poring through phone records, flipping through

14  pages of records to try to understand whether" there was a link between Bayyouk and an insider.  *See*

15  PSR ¶ 43; Ex. J at 19 (Murphy testimony that the SEC staff attorney went through "a large volume of

16  material, piles of boxes of phone records").  Not until approximately December 2007 – more than six

17  months after Bayyouk's obstruction – did the SEC determine Salman was the possible connection

18  between Bayyouk and the Karas.  *See* PSR ¶ 43; Ex. J at 20-24; Ex. K (Trial Ex. 422).  Had Bayyouk

19  not concealed Salman's involvement, "[i]t would have changed the direction of the investigation.  We

20  would have then directly spoken with Mr. Salman.  And we would have done that a lot sooner than we

21  would have if we hadn't had to pore through all the phone records."  PSR ¶ 43; Ex. J at 23; *see also* Ex.

22  L (9/24/2013 Testimony of Jeffrey Chisholm at 4-9 (describing that Bayyouk's connection to Michael

23  Kara was "a big mystery" until early 2008)).

24                                    **ARGUMENT**

25        The overarching goal of a sentencing court is to impose a sentence that is sufficient to "reflect

26  the seriousness of the offense, promote respect for the law, and provide just punishment; to afford

27  adequate deterrence; to protect the public; and to provide the defendant with needed education or

28

UNITED STATES' SENTENCING
MEMORANDUM, CR 12-0420 EMC

4

vocational training, medical care, or other correctional treatment." *United States v. Ressam*, 679 F.3d 1069, 1088-89 (9th Cir. 2012) (*en banc*); 18 U.S.C. § 3553(a)(2).  The Court should begin the sentencing process by correctly calculating the applicable Guidelines range and must "remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007).  The Court should then consider the factors outlined in Section 3553(a) to determine the appropriate sentence. *Ressam*, 679 F.3d at 1089.[2]  If the Court determines that a sentence outside of the Guidelines range is warranted, it must ensure that the "justification is sufficiently compelling to support the degree of the variance." *Id.* (internal quotation omitted).  "[A] major departure should be supported by a more significant justification than a minor one." *Gall*, 552 U.S. at 50.

## I.   THE TOTAL OFFENSE LEVEL IS 17 BECAUSE THE DEFENDANT'S OFFENSE RESULTED IN THE UNNECESSARY EXPENDITURE OF SUBSTANTIAL GOVERNMENTAL RESOURCES

The Probation Office and the government calculate the total offense level under the Guidelines as follows:

| | | |
|---|---|---|
| a. | Base Offense Level, U.S.S.G. § 2J1.2(a) | +14 |
| b. | Specific Offense Characteristic, U.S.S.G. § 2J1.2(b)(2) (substantial interference with administration of justice) | +3 |
| c. | Total Offense Level | =17 |

*See* PSR ¶¶ 61-69.  Because the defendant is within Criminal History Category I, the resulting Guideline range is 24 to 30 months in prison.[3]

---

[2]    Those factors include (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocations training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established in the Guidelines; (5) any pertinent policy statement by the Sentencing Commission; (6) the need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims.  *See* 18 U.S.C. § 3553(a)(1)-(7).

[3]    Without the enhancement, the total offense level 14, which in this case results in a sentencing range of 15 to 21 months in prison.

UNITED STATES' SENTENCING
MEMORANDUM, CR 12-0420 EMC

The defendant objects to application of the 3-point enhancement provided in Section 2J1.2(b)(2). For the following reasons, the Court should apply the enhancement.  Section 2J1.2(b)(2) provides that "[i]f the offense resulted in substantial interference with the administration of justice, increase by 3 levels."  U.S. Sentencing Guidelines Manual § 2J1.2(b)(2).  The Commentary to this Guideline specifies that "substantial interference with the administration of justice" includes "the unnecessary expenditure of substantial governmental or court resources."  *Id.* applic. note 1.  For the enhancement to apply, the government "need not particularize a specific number of hours expended by a government employee."  *See United States v. Tackett*, 193 F.3d 880, 886-87 (6th Cir. 1999).  Rather, the enhancement applies where the government identifies a particular expenditure of governmental resources (time or money), which was "substantial," and which would not have been expended but for the defendant's conduct.  *Id.*; *United States v. Lueddeke*, 908 F.2d 230, 234 (7th Cir. 1990) (affirming application of enhancement where FBI spent two full weeks "trying to sort out the truth"); *United States v. Atlantic States Cast Iron Pipe Co.*, 627 F. Supp. 2d 180, 203-204 (D.N.J. 2009) (citing cases where enhancement found to apply).

Numerous courts have recognized that "if a person is the only source of important information, [his] active concealment of this information will almost certainly change the course of the proceedings, making the investigation more difficult and costly, and hampering the truth-seeking function of government agents. . . . Accordingly, where a defendant actively conceals important evidence of which [he] is the only source, a court may infer that the defendant's interference with the administration of justice was substantial."  *Tackett*, 193 F.3d at 887; *United States v. Sinclair*, 109 F.3d 1527, 1539-40 (10th Cir. 1997); *United States v. Barnhart*, 889 F.2d 1374, 1379-80 (5th Cir. 1989).

Here, the trial record affirmatively demonstrates that Bayyouk set the SEC back approximately six months in its investigative efforts by concealing information only he (and Salman) possessed. Bayyouk's offense forced the SEC "to do a lot of work" piecing together through phone records and other information the connection between Bayyouk and the Karas.  Such an expenditure of time satisfies the enhancement in § 2B1.2(b)(2).

UNITED STATES' SENTENCING
MEMORANDUM, CR 12-0420 EMC

1    For these reasons, the defendant's total offense level is 17, and the Guideline sentencing range is

2    24 to 30 months in prison.

3    **II.    NO DEPARTURE FROM THE GUIDELINES IS WARRANTED**

4    The factors set forth in Section 3553(a) do not support a departure from the Guidelines sentence.

5    To the contrary, this case is within the heartland of other obstruction cases nationwide.  The defendant's

6    obstruction was not a spontaneous act.  The SEC had called the defendant on multiple occasions and the

7    defendant elected to call the SEC back and submit to an interview.  This was a deliberate choice to

8    attempt to mislead the SEC to protect his million-dollar gain and to shield himself and his secret trading

9    partner from exposure.  The defendant has not accepted responsibility for his offense.  Quite the

10   opposite, there is every reason to believe the defendant has evaded responsibility for a more serious

11   insider trading offense.  To date, the defendant has not repaid the trading gains he achieved as a result of

12   inside information, and restitution is not an available option in this case.  Finally, in obstruction of

13   justice cases, the need for general deterrence is high.  Without truthful testimony, the SEC simply cannot

14   fulfill its mission – to protect investors and maintain fair, orderly, and efficient markets.  Without

15   truthful testimony, the guilty are more likely to go free and the innocent are less likely to receive justice.

16   Intentional, corrupt, efforts to obstruct the investigative process such as this require accountability and a

17   severe sanction from the judicial system.

18   **III.    THE COURT SHOULD IMPOSE A FINE**

19   The PSR also demonstrates that the defendant has significant net worth.  He appears to have the

20   ability to pay a substantial fine.  The United States respectfully recommends a fine of $25,000,

21   particularly given the fact that restitution is inapplicable in this case.

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28

UNITED STATES' SENTENCING
MEMORANDUM, CR 12-0420 EMC

7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SENTENCING RECOMMENDATION**

For these reasons, the United States respectfully recommends the Court sentence Bayyouk to the middle of the applicable Guideline range: 27 months in prison.  The United States further recommends the defendant be sentenced to a three-year term of supervised release and ordered to pay a fine of $25,000.

DATED: April 9, 2014

Respectfully submitted,

MELINDA HAAG
United States Attorney

/s/
_____
ROBERT S. LEACH
ADAM A. REEVES
Assistant United States Attorneys